## In the Matter of King, Bankrupt.

## In the Matter of Hyde, Bankrupt.

*(District Court, S. D. New York.* September 14, 1880.)

1. **Bankruptcy—Petition to Set Aside Deeds—Parties.**—A petition to set aside the deeds of an official assignee in bankruptcy, upon the grounds of fraud and illegality, may be maintained where the rights of the petitioners have been thereby injuriously affected, although they were not parties to the bankruptcy proceedings.

2. **Same—Same—Trustees and Cestui Que Trust.**—Such petition can be maintained although the petitioners became trustees for the grantee, in relation to the subject of the conveyance, under title acquired prior to and independently of these deeds.

3. **Same—Same—Suit Pending on Deeds.**—There is no good reason, where an action has been instituted on such deeds, why the petitioners should be remitted to their defence in that action for the purpose of showing there the invalidity of the deeds.

**4. SAME—ACT OF 1841—REPEAL—"FINAL CONSUMMATION."**—A case is not "continued to its final consummation," within the meaning of the act repealing the bankrupt law of 1841, although the bankrupt may have been discharged and his estate distributed, so long as there remains any order, decree, or action for the court, in the proper and usual exercise of its jurisdiction in like cases, to enter or to take, or any redress or relief to be given to any party or person properly applying to the court therefor in the case.

**5. SAME—SALE OF REAL ESTATE—NOTICE OF SALE—MISDESCRIPTION.**—An official assignee in bankruptcy, under the rules of the court, proceeded to sell an interest in certain real property at public auction. It was described in the bankrupt's schedule of assets as "my joint interest in Hunter purchase of lots in Chicago in Co. S. Hyde, managed by Charles Butler, agent in New York, and William B. Ogden, agent in Chicago; cost, originally, $20,000. *This claim may be already legally held by Edward Eldridge, of Boston, under my assignment to him of ninth June,* 1838." In the advertised notice of sale it was referred to as the bankrupt's interest "in sundry lots in Chicago, Ill., purchased with Simeon Hyde, and *assigned* to Henry Eldridge, Boston." This notice also referred to the papers on file in the office of the court for a more certain and full description of the interest advertised for sale. The interest in the property in question never really had been assigned to Eldridge, and the advertised description was therefore erroneous in that particular. *Held*, that such interest passed under the subsequent public sale of the assignee, notwithstanding the erroneous description.

**6. SAME—SAME—NON-DELIVERY OF DEED.**—Such notice also contained the provision, "purchaser paying expenses of the formal deed of sale, *if one be required*, in addition to the amount of purchase." *Held*, in view of this provision, and in view of the fact that there had been a valid sale of the interest in the Chicago property, under which the price had been paid, that the mere non-delivery of a deed would not authorize a re-sale of such interest.

**7. LACHES—APPLICATION TO ANNUL DEEDS.**—Although the doctrine of laches may have some application to a petition to annul deeds inadvertently given under the pretended authority of a court, to which its sanction was improperly obtained, yet it is clear that that principle can have far less force in such case than in a proceeding between vendor and vendee, where the vendee is put in possession under the deed afterwards assailed.

Certain deeds in this case set aside as having been inadvertently and illegally made.

In Bankruptcy, under the act of congress passed August 19, 1841.

*William Allen Butler*, for petitioners.

*B. F. Tracy* and *J. W. Cook*, for respondent, Chapman.

CHOATE, D. J. In these cases in bankruptcy, under the bankrupt law of 1841, applications have been made to set aside and declare null and void certain deeds made or claimed to have been made by Mr. Waddell, the official assignee, under orders of the court entered in the years 1858, 1859, and 1862, authorizing him to sell at private sale certain alleged interests vested in him as such assignee in certain real estate in the city of Chicago.

The ground on which the vacating of the deeds is sought by the petitioners, the executors of one Ogden, is that long prior to the date thereof their testator was in the actual possession of the real estate in question, claiming title thereto as assignee or grantee of the interest, whatever it was, that had belonged to the bankrupts, and that the deeds now in question were not deeds for any valuable consideration, but that they were in fact gifts, so far as the estates of the bankrupts are concerned, which the court neither authorized nor had any power to authorize; that if not mere gifts the deeds were void, because the interest of the bankrupts had been previously sold and disposed of under prior orders of the court, and that the deeds were procured by false and fraudulent representations of matters of fact, whereby the court was deceived and misled into making the orders under which the deeds purport to have been given, and by which alone the giving of them can be justified.

The respondent, Chapman, who claims to be the *bona fide* purchaser for value of the titles made under these deeds, and who alone appears to object to the prayer of the petition, has commenced a suit based in whole or in part on these deeds, or some of them, against said Ogden, which is still pending against the petitioners as his executors, in which suit said Chapman claims an accounting for the rents and profits of that interest in the said lands formerly of the bankrupts, and alleged to be held by said Ogden as trustee for said Chapman, said Chapman's interest as *cestui que trust* being derived through said assignee's deeds.

1. I think it is clear that the petitioners, though not parties to the bankruptcy proceedings, have such an interest in the

matter that they can maintain this petition. They do not appear as mere strangers or *amici curiæ*, suggesting an unlawful or erroneous act or proceeding on the part of the court or its officer, and asking to have it vacated on grounds of public policy, but they appear as parties whose rights are injuriously affected by the act of the officer of the court, alleged to be illegal, inadvertent, or done with a fraudulent and mischievous purpose as to them. I think the court has power to relieve them if they make out their case. The power was exercised in a case similar to the present, in the *Matter of Conant, Bankrupt,* (unreported,) and Judge Betts granted the relief here asked to a party occupying a position somewhat similar to that of these petitioners.

2. Nor do I find anything in the act repealing the bankrupt law of 1841 which precludes the court from entertaining this petition. The act contains the proviso that it "shall not affect any case or proceeding commenced before the passage of this act, or any pains, penalties, or forfeitures incurred under the said act; but every such proceeding may be continued to its final consummation in like manner as if this act had not been passed." It is urged that after the discharge of the bankrupt, and the final disposition and distribution of his estate, the proceeding has reached its final consummation, and the power of the court to pass any order in the case is taken away by this proviso. I think, however, that this proviso clearly preserves in full force all the power and authority which, under the bankrupt law of 1841, this court had to act in any case commenced before the passage of the repealing act. Full force is to be given to all the language used, and the first clause distinctly provides that the repeal shall not *affect* any pending case; and the last clause, giving express authority to continue to final consummation all such cases, though perhaps unnecessary, was not designed to be restrictive of the prior clause. Nor, in a large and proper sense, is a case carried to its final consummation so long as there remains any order, decree, or action for the court, in the proper and usual exercise of its jurisdiction in like cases, to enter or to take, or any redress or relief to be given to any

party or person properly applying to the court therefor in the case.

3. It is claimed on behalf of the respondent, Chapman, that, although the legal estate in the lands in question became vested in Mr. Ogden, and although, from a period long prior to these deeds, he claimed to hold to his own use the beneficial or equitable interest which had formerly belonged to the bankrupts, that, as to the interest of the bankrupt Hyde, he, Chapman, is in fact the assignee of that interest by another and independent title, anterior and superior to that under which Ogden claimed to have obtained the same interest as the assignee of Hyde, and that the circumstances under which Ogden acquired the legal title to Hyde's share were such as in law and equity made him a trustee for the assignee of this beneficial interest of Hyde. Hence it is argued that, as Ogden was a trustee for Hyde's assignee, and as Chapman is Hyde's assignee, Ogden and his representatives cannot raise this question with Chapman; that, Ogden being Chapman's trustee, he and his representatives cannot attack his title; that they are bound, in all things, to protect and defend the title and interest of Chapman in the lands to which the trust relates. But the argument is fallacious, and the point wholly irrelevant to the present inquiry. Whatever title Chapman may have to Hyde's interest, acquired before and independently of these deeds, cannot be affected or impaired by the vacating of the deeds; and, as to any such title, Ogden's attack on these deeds is in no sense a violation of any relation or duty of trust which may exist in reference to such earlier title. In respect to the title claimed by Chapman to have been created in him under these deeds themselves, no relation of trustee and *cestui que trust* can possibly arise between the parties if the deeds are void, or were acquired by a fraud, to which, as alleged in the petition, Chapman was a party. No party can claim the benefits and protection due to a *cestui que trust*, who has acquired the apparent interest of a *cestui que trust* by means of a fraud practiced upon or against the rights of the alleged trustee. Such a claim would be too absurd for discussion. I have, therefore, treated as

wholly irrelevant the testimony relating to the existence and effect of the disputed assignment by Simeon Hyde to McNulty and Chapman, under which Chapman derives his alleged earlier and independent equitable interest as Hyde's assignee. It has nothing to do with, and cannot affect, the questions involved in these applications, which are simply of the validity and *bona fides* of the deeds in question, and Chapman's complicity in the fraud, if they are void for fraud, and of the petitioners' alleged laches in making the applications to set them aside, which, it is claimed by the respondent, should now preclude them from the relief asked for. We come, therefore, to the consideration of those questions.

The deeds in question made by Waddell, as assignee in bankruptcy of Henry King, are five in number, as follows: (1) A deed to Gordon L. Ford, dated July 15, 1845, but acknowledged and admitted to have been executed October 26, 1858; (2) a deed to Gordon L. Ford, of the same date, and executed on the same day as the preceding; (3) a deed to Isaac L. Hunt, dated December 3, 1858; (4) a deed to Isaac L. Hunt, dated January 19, 1859; (5) a deed to Chapman, the respondent, without date, but acknowledged July 11, 1862. The deeds in question made by Waddell, as assignee in bankruptcy of Simeon Hyde, are three in number, as follows: (1) A deed to Gordon L. Ford, dated October 26, 1858; (2) a deed to Isaac L. Hunt, dated January 19, 1859; (3) a deed to Chapman, the respondent, dated July 10, 1862.

It is conceded that the two deeds to Chapman were taken for the purpose of correcting a supposed error in the previous deeds, which error, it is now admitted, did not exist, and if a case is made out against Chapman for vacating the other deeds, these must also be vacated on the same grounds. It is unnecessary, therefore, to state the case, except with reference to the six earlier deeds. Long before the making of these deeds, certain proceedings were had in this court in relation to the interest of the bankrupts supposed to be affected by the deeds. Henry King's schedule of assets thus refers to the matter of this property: "My joint interest in Hunter purchase of lots in Chicago in Co. S. Hyde, managed by Charles

Butler, agent in N. Y., and William B. Ogden, agent in Chicago, cost, originally, $20,000. This claim may be already legally held by Edward Eldridge, of Boston, under my assignment to him of ninth June, 1838, on settlement of accounts with Simeon Hyde." This reference to settlement of accounts with Simeon Hyde is explained by the facts shown in the testimony that, in this and other land speculations undertaken by Hyde and King jointly, the money required therefor was furnished by Hyde largely in excess of his share, and the documentary evidence of their joint interest was held by and in the name of Hyde, so that King's claim was only available to him upon payment of these advances on his account, which it appears he never was able to pay.

On the eleventh of June, 1845, Waddell, the assignee, made a report to the court that certain property, including the item above referred to, was "of uncertain value, and ought to be disposed of at public sale, without incurring further delay or expense," and, in conformity with the rules of the court, he proceeded to sell the same at public auction. The rules required him to advertise the sale, and the form of the advertisement recited that, "by virtue of sundry decrees," etc., "I will sell at, etc., all the property and rights of property of every name and nature which became vested in the official or general assignee by the decrees aforesaid, the following assets hereinafter noted, which are more particularly set forth in the papers on file in the office of the said court, as by reference thereto, will more fully appear"—"purchaser paying expenses of the formal deed of sale, *if one be required*, in addition to the amount of purchase." * * * "In the matter of Henry King"—"His interest in five lots of land in the town of Joliet, Ill.; also in sundry lots in Chicago, Ill., purchased with Simeon Hyde, and assigned to Henry Eldridge, Boston," etc.

4. There can be no possible question that the property referred to in the advertisement as "his interest in sundry lots in Chicago, Illinois, purchased with Simeon Hyde," etc., is the same property and interest intended to be described in the official report of the assignee, although in the report it is

stated that it *may be* held by Eldridge under the assignment, and in the advertisement it is described as "Assigned to Henry Eldridge." At the sale on the fifteenth of July, 1845, the assets of Henry King, including this interest in the Chicago lots, were sold to Gordon Burnham, the highest bidder therefor, who paid for the same, but called for no deed. On the thirtieth of July, 1845, Burnham sold, for a valuable consideration, his interest in said property to Charles Butler. It is claimed, however, on the part of the respondent, Chapman, that King's interest did not pass by this sale to Burnham, nor by Burnham's sale to Butler, because the advertisement erroneously described the property as included in the Eldridge assignment, and because the interest of King, such as it was, being real and not personal, no deed of it was given, and, consequently, the interest remained vested in the assignee, and could be subsequently disposed of by him under the order of the court. I think that neither of these points is well taken, so far as to justify or sustain, as valid, any subsequent sale of King's interest except in confirmation of the title made under the sale to Burnham. That the purchase by Burnham was an actual purchase for value and in good faith, and that, in reliance thereon, he sold the interest which he so obtained to Butler, for value, is not disputed. Conceding, what is admitted by both parties, that no interest in the property in question passed under the Eldridge assignment, and that, therefore, this part of the description was a mistake, yet this mistake is not sufficient to deprive the purchaser of his right to the bankrupt's interest in this asset, which it clearly appears on the face of the transaction the assignee understood that he was selling, and the purchaser understood that he was buying. It is merely a failure to describe truly, in one respect, the subject offered for sale, which, by other descriptive terms, is sufficiently and clearly identified. The very advertisement in which the mistake occurs contains the correction of the mistake, for it refers, for a more certain and full description, to the papers on file, the schedule and the report, which show that the interest *may have been,* not that it *was,* assigned to Eldridge. If the adver-

tisement had described the interest to be sold as King's interest in said lots, so far as that interest was included in the Eldridge assignment, it might have been inferred that the assignee had concluded not to offer the asset described in the report; but no such purpose can be inferred from the language used in the advertisement, while its terms do plainly imply that he intended to sell the same asset therein described. The case is clearly one in which the maxim "*Falsa demonstratio non nocet*" applies. If the assignee had claimed that the mistake affected injuriously the sale, which indeed cannot be presumed, or that the purchaser in fact did not understand that he was buying this asset, except so far as it was covered by the assignment, he could have applied to the court to set the sale aside on that ground. Not having done so, he cannot repudiate it or treat it as no sale because of the false description.

5. There having been, then, a valid sale, under the order of the court, of this asset of the bankrupt, and that sale having been executed by the payment of the price, the court had no power to authorize the sale of the property a second time. Its power was clearly limited to one actual sale, by which this property was turned into money. So far as that asset was concerned, the court had exhausted its powers, except to do what was proper to carry it into effect and vest the title in the purchaser. It is immaterial that no deed was ever given, even if the interest was real, and such that the legal title would pass only by deed. It is true that a naked, barren legal title may be conceived to remain vested in the assignee, but not for the use or benefit of the creditors of the bankrupt. They have, through the assignee, already received the full value of the property in money, to be distributed among them in dividends on their debts. They can claim no more under the bankrupt law. To hold that the court could order it to be sold again, and turned into money, because no deed passed, would be to hold that it has power to take property in which the creditors have no interest, and distribute it among them. No bankrupt law ever gave such a power to a court in bankruptcy. There is no analogy be-

tween such a case and a second sale by an individual who is vested with the legal title to real estate, and who can vest that title in a *bona fide* purchaser for value as against a prior purchaser by parol or by deed unrecorded. For sound reasons of public policy this is permitted. But the question here is of the *power* of a court of justice, vested through its officer with a legal title. That power must be limited by the obvious purpose for which the title is vested in it, and must be exercised in conformity to justice and right. The court, therefore, must be held to be without power to make a second sale —*First*, because the purpose for which it was vested with the title has been entirely accomplished; and, *secondly*, because a second sale, in disregard of the rights of the first purchaser, would be so obviously unjust, impeaching and setting at naught its own prior action, that no grant of power authorizing it to sell can be construed as giving it the power to do so great an injustice.

Any second sale, therefore, of the interest of the bankrupt King, not in confirmation of the first sale, must be treated as inadvertently made, and an exercise of power not conferred upon the court, and upon the application of any party in interest will be set aside, revoked, and declared null and void on that ground.

The suggestion that the want of a deed gave the court authority to make a second sale is especially without force in this case, as the very form of the advertisement invited the purchaser to dispense with a deed, if he did not wish to incur the expense.

6. After the sale to Burnham, and Burnham's sale to Butler, nothing further was done, so far as appears, in reference to the Henry King interest, till October, 1858, when Gordon L. Ford applied for and obtained the first two deeds in question, which are dated back to July 15, 1845, the date of sale to Burnham. No order of the court appears to have been obtained for the making of these deeds. The only explanation of them given by Chapman is that contained in the affidavit of Waddell, made a part of Chapman's answer, that they were given to Ford at the request, in writing, of Burnham, which

request he, Waddell, has searched for and cannot find. This explanation is denied by Burnham, who was examined as a witness. Waddell was not called as a witness. The deeds are suspicious on their face, being dated back 13 years, and being executed to Ford, as is said, but not proved, at the request of Burnham, 13 years after Burnham had sold for value to Butler all that he purchased. They must clearly be held upon the evidence to have been executed by the assignee without any authority or color of authority, and not in furtherance or confirmation of the title made under the sale of July 15, 1845, and they must, therefore, be annulled and set aside. The other four deeds appear to have been made under orders of the court. These two deeds, which are not supported by any special order of the court, must have taken effect, if at all, as deeds made in pursuance of the sale to Burnham, in July, 1845, and for that reason, probably, were they dated back to that time. The second of these two deeds recites the sale of July 15, 1845, and the payment of the consideration as if it were made in pursuance of that sale. In describing the property, both of these deeds refer to it as included in the Eldridge asssignment, and whoever procured them was then apparently under the impression that King's interest passed by that assignment. Ford, to whom they were made, was a clerk in Waddell's office. The third deed of the Henry King interest, which was made to Hunt in December, 1858, was applied for by Hunt in a written request made to the assignee, dated October 9, 1858, as follows: "I wish to procure from you, for a nominal consideration, and your costs and charges, including your compensation to counsel herein, (not exceeding in the aggregate the sum of $25, herewith enclosed, unless by a subsequent agreement with me,) the enclosed amount being advanced for your preliminary examination, and such reference to counsel as you may desire, whether I obtain the conveyance which I seek or not, to-wit," (here follows description of land) "undertaking hereby to obtain and communicate such information as I may possess or see fit to acquire upon the request of yourself or your counsel in the premises in aid of your examination herein".

It seems, by the evidence, that this was a printed form of application in use at that time for the purpose of procuring what were represented to be worthless assets vested in Waddell as official assignee. Upon this application the assignee made a report to the court dated December 2, 1858, reciting "that an application has been made to me to procure all the interest which the said bankrupt had and which became vested in the assignee by the decree aforesaid in and to the following described premises, to-wit," (giving same description;) "subject, nevertheless, to a sale of the same many years ago by the assignee, and which has been subsequently conveyed by the assignee, for a nominal consideration, and the costs of the assignee and his counsel therein. The title hereby sought being of no pecuniary value to this estate, and the assignee having carefully examined the subject-matter thereof, now moves the court for an order as follows: Ordered, that the official or general assignee be authorized to sell and dispose of the property herein referred to at private sale, pursuant to the rules and practice of the court." On the same day, December 2, 1858, the judge of this court indorsed on this report the following memorandum: "Let an order be entered pursuant to within report." Afterwards the deed to Hunt was made. It recites a consideration of one dollar, and acknowledges its payment. It conveys by the same description the land described in the application and the report, but instead of making the conveyance subject to a former sale made by the assignee, as authorized by the order based on the report, it makes it "subject, nevertheless, to any prior sale made by the said assignee, *the conveyance of which has been placed on record in said county,* (naming the county in which the lands lay.) It also adds, what was not in the report, the following: "In which said former conveyance I only conveyed or intended to convey such assets of the said Henry King as were embraced and included in a certain indenture, (referring to the Eldridge assignment,) as on reference will more fully appear." The fourth deed of the King interest was made to Hunt on an application in the same form, describing a different part of the property, and upon a similar report and

order, with the same recital of one dollar consideration, and with the same variance between the report and the deed as to the former sale, to which it was made subject. It is obvious, upon a comparison of these two deeds to Hunt with the prior deeds to Ford, that they were made to cover the same property described in the earlier deeds as being within the Eldridge assignment, and in the later deeds as not being within it; and the sale subject to which these two later deeds were made, was not the sale of July 15, 1845, to Burnham, which was the only real prior sale made by him, and the only sale which, under the order of the court, the assignee had any authority to make them subject to, but they were made subject to the two deeds to Ford, which, it is proved, had been recorded in the county referred to.

It is obvious that these two deeds to Hunt were not made in confirmation of the sale to Burnham, nor subject to that sale, as the court directed, but in hostility thereto, and in violation of the order of the court, were made subject only to the two deeds to Ford, and they must, for these reasons, be set aside.

It is objected to them also that they were gifts, being for a merely nominal consideration. I think the evidence establishes this fact. The recital of a dollar paid is in entire conformity with the applications under which they were made, which were for a conveyance upon a *nominal* consideration of property having no pecuniary value to the estate. The only money proved to have been paid was the fee or bribe paid to the assignee for a pretended examination which he is shown not to have made, and the service of counsel who does not appear to have been employed. There is no question involved of a *bona fide* purchase by Chapman under these deeds, for their invalidity, their variance from the order of the court, appears on their face and on the order referred to therein.

Aside from this consideration, I am satisfied upon the proofs that Chapman himself procured them to be made to Hunt; and, without going at large into the evidence, it is enough to say, as to these deeds of the King interest to Hunt,

that they are void, because there had been a prior sale of King's entire interest, duly executed under the order of the court, because they were not made for a valuable consideration moving to the estate of the bankrupt, because they did not conform to the order of the court under which they purport to be made, but on the contrary varied therefrom in a material respect as to the interest purporting to be conveyed, and because they were procured by the respondent, Chapman, by fraud and deceit. The variance between the deeds and the orders cannot have been accidental, and being intentional was itself a gross fraud on the court, as well as upon the prior purchaser, on the part of all concerned in procuring the deeds.

Simeon Hyde purchased his interest in the property in question in 1835 of one Porter, and he held a certificate executed by Charles Butler, dated October 10, 1835, to the effect that he was entitled to one-tenth of the property "to be accounted for in money (and not in land) as a personal interest when the said property shall be sold and the avails thereof realized." On the tenth of December, 1836, Simeon Hyde executed an assignment of this certificate, and of all his right, title, and interest growing out of it, to James N. Hyde. This assignment was made to secure James N. Hyde against indorsements made for Simeon Hyde. In Simeon Hyde's bankruptcy schedule, dated August 19, 1841, the property is described as "one-tenth of an interest with Charles Butler and others in what is termed the Hunter purchase, consisting of a large number of lots in Wolcott's addition, north side of the river, in Chicago; William B. Ogden, of Chicago, agent." Meanwhile, James N. Hyde had made an assignment to trustees for the benefit of creditors, and on the eighth of May, 1844, the assignees of James N. Hyde assigned, by an instrument under seal, the said certificate, and all the interest of James N. Hyde therein, and all the estate, right, claim, and interest in the premises referred to therein to William B. Ogden for a valuable consideration. Ogden also purchased the shares of the other owners and has ever since been in possession of the lands, claiming to be their sole owner. On the twenty-seventh of November, 1843, Waddell, the general

assignee in bankruptcy, made his official report that the remaining assets of Simeon Hyde were of uncertain value, and ought to be disposed of at public sale, without further expense or delay, and, according to the rules of the court, he advertised them for sale. Among the assets thus advertised was the following: "His residuary interest in an assignment to James N. Hyde, in 1836." The advertisement referred to the inventory on file as setting forth the assets. The schedule of the bankrupt thus referred to, after enumerating the interest in the Hunter purchase, as given above, and some other assets, contained a statement that all the bankrupt's interest in said property, and also his claim against Henry King, were assigned by him, in 1836, to James N. Hyde, as security, etc. The assets thus described were bid off by one Hallahan at the sale for $1.50. He never called for a conveyance, or made any claim against Mr. Ogden, as regards this property. It has been made a question in the case whether Hallahan paid the price bid. In proof of it, among other evidence, the petitioners have offered the testimony of a witness as to the contents of a book of account kept by the assignee. It is insisted that as this book is one which the assignee was required to keep, it is in the nature of a public record, like the files of the court in the proceeding, and that evidence is admissible of its contents.

I do not see, however, any principle upon which this book of account can be excepted out of the general rule that a writing, if in existence, must be itself produced. But rejecting this evidence I think there is proof enough that the price was paid by Hallahan. The sale was for cash, and there were no subsequent proceedings on the part of the assignee indicating that the sale was defeated by the default of the purchaser; and the presumption is that the assignee did his duty and collected the purchase money of the person to whom the sale was made. There is also some evidence, from an employe in the office of the assignee, tending to show that in all cases the price was paid. This case does not differ, therefore, in this respect from that of the sale of the interest of the bankrupt King to Burnham. The sale exhausted the

power of the court over this asset. The fact that the purchaser neglected to call for a conveyance did not give the court any authority to sell the property again to another party. Yet, on the twenty-sixth day of October, 1858, G. L. Ford made a written application to the official assignee for the purchase of Simeon Hyde's interest in this property, in the form used in the applications already mentioned in the case of the King interest. The application seems to have been made in the case of Simeon P. Hyde, another bankrupt. It recited as follows: "I am the owner by purchase from you, in 1845, of all the interest which Henry King, a bankrupt, had in the following, set forth in his schedule, to-wit: My joint interest in Hunter purchase of lots in Chicago, in Co. Simeon Hyde, &c. This claim may be already legally held by Edward Eldridge, in Boston, in my assignment to him of 9 January, 1838, on settlement of account with Simeon Hyde." The application asked a conveyance, for a nominal consideration and expenses, as did the others. It stated that the interest was of no pecuniary value to the estate. There seems to have been some confusion in entitling the papers in the matter of Simeon P. Hyde. There was such a proceeding pending in the court. Some of the papers have been altered by erasing the "P.," when and by whom there is no proof. The assignee's report, however, on this application, was made in the matter of Simeon Hyde. It is in the form of the reports heretofore referred to. It recites Ford's statement that he had become the owner, by purchase from the assignee, of Henry King's interest on the fifteenth of July, 1845, and states that this is so.

Thereupon the judge indorsed an order, pursuant to the report, authorizing the assignee to dispose of the property at private sale. Under this order the assignee made a deed, dated and acknowledged October 26, 1858, conveying "all that tract of land known as the Hunter purchase of lots in Chicago, as referred to in any manner in an instrument of writing made with one Edward Eldridge," etc. It is quite evident that the statement contained in the application and report that Ford had purchased the property of the assignee

in 1845 was entirely false. The only transfer from the assignee to Ford of the King interest was that made in 1858, and *post-dated* to July 15, 1845, the date of the sale to Burnham. This prior purchase was the sole ground upon which the court was asked to authorize this sale to Ford, and this deed must be set aside, not only because the power of the court to sell was exhausted by the sale to Hallahan, and because it was not a sale at all, but a gift, being without consideration, so far as the estate was concerned, but also because it was procured by a false statement that the prior sale of the King interest had been made to Ford, whereas it was, in fact, made, not to him, but to Burnham; and long before this application, order, and conveyance, Burnham had sold his interest, for value, to Butler, as hereinbefore stated.

The only remaining deed to be examined is that from the assignee to Isaac L. Hunt, of the Hyde interest, dated January 19, 1859. The application of Hunt to the assignee is dated January 14, 1859. The official report of the assignee, and the order, are dated January 18, 1859. All these papers are in the same form as the others, above referred to, except that this application states no reason for asking the conveyance other than the wish of the applicant to procure a conveyance. The report states that a conveyance is applied for "subject to any former conveyances which may have been made by the assignee of the same, and as may appear of record." The deed is a conveyance, "subject to any former conveyances by the said assignee in said matter, and on record in said county." The prior deed, in fact recorded, was the deed to Ford. The deed to Hunt was, therefore, made subject only to that conveyance, and not to the conveyance previously made in 1845 to Hallahan. The proof is that this deed to Hunt was a gift, and not a sale, and for this reason, and because of the prior sale to Hallahan, it must be set aside as inadvertently and improperly given, as well as because it was, like all the earlier deeds, procured by an improper, illegal, and corrupt dealing with the official assignee.

As to all the deeds, it is evident from the proofs that the assignee was carrying on a trade in pretended or fictitious

assets of bankrupt estates, not for the benefit of the estates of the bankrupts, or in the proper and orderly administration thereof, but for his own benefit, and for the benefit of persons seeking to avail themselves of such pretended titles for purposes of litigation. While all the interests so disposed of were declared to be, and probably were, of no value whatever to the estates to which they were claimed to belong, the applicants paid very considerable sums in fees and charges of the assignee, for examinations into the facts certified to the court as made, but, in reality, not made at all, and for pretended counsel fees. The applicants, therefore, had an interest to subserve of some value, in their own estimation, in making these purchases.

The purchaser, Hunt, in this case, was a mere agent of the respondent, Chapman. And Chapman's motive in buying up these possible interests was to base upon them claims, to be prosecuted by litigation against parties in possession of the property. And in March, 1862, he commenced an action against Mr. Ogden, based on these deeds, as above stated.

The use that has thus been made of this court to promote litigation is highly improper and scandalous. And as the deeds made by the assignee were clearly such as the court had no right to authorize, there is no good reason why the petitioners should be remitted to their defence in that action for the purpose of showing there the invalidity of the deeds, or why the respondent should retain the unjust advantage which the possession of the deeds, given under the apparent authority of this court, confers upon him.

It is, however, insisted that it is now too late to have the deeds set aside; that application therefor should have been made at once on the discovery by Mr. Ogden of the claim made under them. When a transaction *inter partes* is sought to be annulled for fraud great diligence is often necessary, and delay, with knowledge of one's rights, will be deemed acquiescence, especially where the delay has occasioned a change in the position of the parties relatively to the subject of the contract. The doctrine of laches thus applied is very familiar. The present, however, is not a

transaction *inter partes*. It is not an application to set aside deeds under which any rights in possession passed. It is an application to annul deeds inadvertently given under the pretended authority of the court, and to which its sanction was improperly obtained.

Without holding that the doctrine of laches has no application to such a case, it is clear that that principle can have far less force in such case than in a proceeding between vendor and vendee, where the vendee is put in possession under the deed afterwards assailed. In this case the misrepresentations by which the court was induced to make the orders do not appear to have been discovered by Mr. Ogden in his lifetime, nor by his executors, up to the time when they put in their answer in Chapman's suit, in September, 1878. The fact is adverted to by the respondent, Chapman, that these misrepresentations are not set out in the petitioners' answer in that suit. It is hardly conceivable that if the facts were then known to the executors they should not have been set up in defence. As regards the other grounds of invalidity—the want of power in the court to make a second sale of the same property, or a gift—they are grounds not for declaring voidable and avoiding the deeds, but for declaring them to have been absolutely void and of no effect from the beginning, so that no rights whatever can have been acquired thereby through the acts of the vendee or the laches of any other party. The petitioners' testator was undoubtedly negligent in inquiring into the history and validity of these conveyances. Under advice of counsel he seems to have relied on his demurrer to the complaint as a sufficient defence till that was finally disposed of in December, 1875; but there has been no loss of evidence by the death of any party who could throw light on the transaction. Waddell, Ford, and Hunt are all living, and have not been called as witnesses. There seems to be no reason to doubt that the respondent could have proved, if the fact were so, that a consideration was paid to the bankrupt estates for these conveyances. He has not attempted to do so. As to the deeds to Hunt, he admits in his answer that he procured them to be made, and

paid the *assignee* $300 for them. It is clearly shown by the evidence that this was exclusively fees, or, more properly speaking, bribes paid to the assignee personally for promoting his wishes in the matter. It cannot be accounted a considertion enuring to the estate, and this statement of this payment in the answer as the consideration, is virtually an admission that no other consideration passed, and confirms the conclusions drawn from the petitioners' proofs that the conveyances were gifts from the estate, and not sales such as the court directed to be made. On the whole case, I can see no possible injury that has resulted to the respondent, Chapman, from the petitioners' delay, and, considering the peculiar nature of the grounds of invalidity relied on, I think there is no reason for denying the petitioners the relief asked on account of the delay in making their applications.

From beginning to end, these transactions show a common purpose to obtain a colorable title from the assignee, which should be superior to or supersede the title made under the auction sale. In every instance where in the deed the rights under a former sale are reserved or saved, the deed is more favorable to the grantee than the order based on the assignee's report. This is true of the last deed to Hunt, as well as of the earlier deeds. That deed saves the rights under an earlier recorded deed only, while the report and order will at least bear the construction, and were probably intended to convey to the court the impression, that what was applied for was a deed subject to a prior sale, of which a deed *may* have been recorded, thus saving the rights under that sale, whether the deed was recorded or not, which is the only condition on which the court could or would, except by inadvertence, have authorized a second sale. This feature of the transactions, common to them all, is itself sufficient to stamp them as designedly fraudulent, and the respondent, Chapman, who procured the deeds to Hunt, must be held upon the proofs to have been the principal in this fraud. So far as appears he was the only party concerned in the transaction who had any motive or interest to obtain the deeds. He is shown by the proofs to have been actively engaged at and before this

time in litigation in Chicago, in which the rights of the creditors of Henry King were involved, and to have had some interest in that litigation which these deeds might subserve. I do not find it necessary to determine the question raised, whether the copy of his deposition, which is in the record of the Chicago suit, produced on the hearing, is competent proof of what he there testified to, in the particulars in which he denies the accuracy of the copy. Without this, the material allegations of the petition are fully proved, and the deeds must be set aside as inadvertently and illegally made by the assignee, on the grounds above referred to; and let an order also be entered that no further sale or conveyance of any of the assets of the bankrupts be made under the authority of any previous order of the court without further application to the court.